## LUCY NASH v. DANIEL DOYLE.

*Bastardy. Evidence.*

The complainant in a bastardy case, having admitted, on cross-examination, that since the birth of the child, and after she had sworn it on the defendant, she had stated to parties named that the child was not begotten by the defendant but by one White, and that she had made affidavit to that effect, in which she had stated the circumstances under which the child was begotten, and that she was induced to swear it on the defendant by the importunities of White and his wife, it is *held*, that what she said when the proposition was first made to her to swear the child on White, and that she then refused to swear it on him, and stated that the child was not his, but was the child of the defendant, was of the *res gestæ* and admissible.

*Held*, that there was evidence in the case tending to show that the defendant had knowledge of or participation in the attempts to induce the plaintiff to swear the child on White.

THIS was a complaint for bastardy, prosecuted by the overseers of the poor of Underhill, for the benefit of that town, under the statute provisions for that purpose. Trial by jury, and verdict for the defendant, at the April Term, 1867, PIERPOINT, Ch. J., presiding.

On the trial, the plaintiff was called as a witness and testified that she was an unmarried woman, and had never been married; that she had been delivered of a bastard child at the time stated in the complaint, and that the defendant was the father of the child. She also stated the time, place and circumstances under which the child was begotten. On cross-examination she admitted that since the birth of the child, and after she had sworn it upon the defendant in this proceeding, she had stated to one Dixon, attorney of the defendant, and one Hood, a justice of the peace, who came to her residence with Dixon, that the child was not begotten by the defendant but by one Russell White; and that she had made an affidavit to that effect before said Hood as justice, in presence of Dixon, in which she had stated the circumstances under which the child was begotten by White; and that she had been induced to swear it upon the defendant by the importunities of White and his wife.

The plaintiff's counsel then resumed the direct examination, and inquired of her respecting an interview she had with Richard Doyle (a brother of the defendant.) In answer, she said Richard Doyle came to see me the day before the child was born; he claimed to be

Nash *v.* Doyle.

a lawyer from Lowell, or some place a great way off, and said he made it his business to help persons in cases like mine. He wanted me to swear the child on to White, as I should get more money for it ; that the defendant was a poor miserable cuss, and could get nothing from him. The plaintiff's counsel then offered to show what she said to R. Doyle on that occasion, and that she then refused to swear the child on White, and stated that the child was not his, but was the child of the defendant. To this the counsel for the defendant objected, and the court excluded it. To this ruling the plaintiff excepted. The plaintiff further testifies as follows : The defendant and Dixon came to see me after I had sworn the child on the defendant, and after the child was born. The defendant then said the child was not his. I told him it was, and told him he ought to be hung up by his heels. Nothing was said at that time about White. Dixon said nothing, only he said he did not think the child was the defendant's. Dixon and the defendant came again about a week afterwards ; Shipman was then present. The defendant again said it was not his child, and I said it was. The next time Dixon, Warner and Stone came there and wanted me to go to Dixon's office. I did not go, and they did not say what they wanted me to go there for. Afterwards Dixon and Hood came to see me. I had a talk in a room alone with Dixon. Dixon said if I would swear it on to White, he would go and get $400. of him and let me have a part of it, and Doyle have a part of it ; and would let Hood or Shipman keep my part for me. He wanted me to sign an affidavit that it was White's. He said it would do me no hurt to sign it. I did sign it before Mr. Hood. Hood was in the kitchen when I had the conversation with Dixon. I signed it before Hood, as an affidavit. I never had any intercourse with White in any way.

*Re-cross-examination.* Dixon was there five or six times. R. Doyle said, when he came to see me, that he came there on the part of his brother. Hood wrote the paper after he came into the room, and I signed it and swore to it. Dixon and Hood both were present when what was said about getting the money of White, was said by Dixon.

The plaintiff introduced Russell White as a witness, who testified

as follows: I never had any intercourse with the plaintiff at any time. Dixon came to see me in the fall after the child was born, I think. He said he was attorney for the defendant, and was going to make a defence; that he had seen the plaintiff, and she had sworn the child on to me, and that there was no getting rid of it unless I would give Doyle about one hundred dollars, and him, Dixon, twenty-five dollars. He would then get her to swear it on to some one else; and next time he would get her to swear it on to some one out of the country, who would not contest it. I refused to have anything to do with the matter. The plaintiff called Jacob Morrison who said: I went to see the plaintiff with the defendant's brother; Doyle told her he was a lawyer from New York, and he asked the plaintiff if the child was the defendant's, and she said "yes." He did not tell her who he was. He then told her she had better lay it on to White, as he was worth more money, and she would get more money than she would to lay it on to the other fellow. She said she "would not lay it on to White because he was not guilty."

It appeared that said Dixon was an attorney at law, and was attorney of record in this case for the defendant, and had been engaged as such before the first interview he had with the plaintiff, as above stated, and accompanied the defendant on that occasion. It also appeared that Richard Doyle, the defendant's brother, was not a lawyer, and had never resided in Lowell; that he lived in Underhill; that he was bail for the defendant in this proceeding,

" Counsel for the plaintiff claimed that the attempt to induce her to swear the child upon White, and to induce White to settle for it by the means and in the manner above stated, was strong evidence against the defendant as tending to show him consciously guilty of the paternity of the child, especially if the jury should find that the child was not White's."

In respect to this claim the court told the jury that any such attempt, if found to be true, should be taken against the defendant as tending to show that he was the father of the child,—provided such attempt was made through the agency or procurement, or with the knowledge and assent of the defendant. But as there was no evidence in the case tending to show that the defendant had any

agency in procuring the attempt, or any knowledge whatever of anything that was said or done either by Richard Doyle in his interview with the plaintiff, or by Dixon in his interview with the plaintiff, or with White, respecting such attempt, the evidence tending to show such attempt, so far as it concerns this point, may be laid out of the case,—to this the plaintiff excepted. The court explained fully to the jury the difference in the application and bearing of this evidence upon the first and upon the second point.

In other respects the charge of the court was such as the case called for, and was not excepted to.

*L. F. Wilbur* and *E. J. Phelps*, for the plaintiff.

*Hard & Shaw*, for the defendant.

The opinion of the court was delivered by

BARRETT, J. The statement and affidavit, admitted to have been made by the plaintiff, were important matters of evidence-in-chief in behalf of the defendant, as well as in contradiction and impeachment of the plaintiff as a witness swearing that the defendant was the father of the child. Having been evoked by the defendant, for the purpose of using them against her on the trial, it was proper that she should have opportunity to state the history of the matter, so far as it bore upon, and resulted in her giving said affidavit, and making said statement. The proper force and effect to be given to them as evidence-in-chief for the defendant, as well as contradicting and impeaching her, would be affected by the circumstances and occasion of their being made, and by what was done and said in the interviews between her and others upon the subject, which led to and resulted in her making them. The proposition and solicitation to swear the child on White was first made to her by said Richard, the day before the child was born. The manner in which she responded to that proposition and solicitation when first made, would be very significant, as an incident in the course of means and events that entered into the history of that statement and affidavit. It was claimed in her behalf, and the evidence tended to show, that she was

brought to that result, not as a volunteer, but by appliances and inducements addressed to her by the friends, and by the professional adviser of the defendant. If she had received said proposition and solicitation with a ready assent, that fact would have given much greater force to her subsequent statement and affidavit, in their bearing against her, than if she met them with a prompt denial. As the matter was left on the cross-examination, it was to be taken that she had made said statement and affidavit of her own motion. It seems to us, that it was fully as material, and just as proper, to show by her the reply she made to Richard, as it was to show that he made the proposition and solicitation, or that Dixon and the defendant called on her afterwards on the subject of the prosecution, and what was between them, or that Dixon and Hood called on her when the affidavit was procured, and what was said between her and Dixon. The important point was, what did that affidavit signify, as bearing on her truth and credibility. That, in a large measure, would depend on how it came to pass ; how the idea of swearing the child on White originated ; how it was treated by her when it was first proposed ; how it was nursed and developed by those in the interest of the defendant, and finally assumed expression by her in her statement and affidavit.

What she said in the course of these events could not be proved as substantive facts in her own behalf, either as tending to show that the defendant was the father of the child, or as tending to corroborate the testimony she had given to that effect. But, when the defendant availed himself of the affidavit as a means of impeaching her truthfulness, what she said as part of the interviews and events by which that affidavit was begotten and brought forth, is of the *res gestœ.* It appertained to the affidavit, entered into its creation, bore upon its quality, affected its force as evidence when used by the defendant. We think the offer should not have been rejected.

The only other ground of exception is, that the court held that there was no evidence in the case tending to show that the defendant had any agency in, or knowledge of, the attempts, by his brother Richard, or his attorney Dixon, to induce the plaintiff to swear the child on White.

It is true that there was no direct evidence to that effect. But we think that it cannot properly be held that there was no evidence. There was direct evidence that such an attempt was made by Richard and by Dixon. The relation which they sustained to the defendant and to the subject was shown, the one, a brother and bail; the other, an attorney of the defendant in this matter. It was shown that the defendant called on the plaintiff twice, after Richard's first call and solicitation, on the subject of the prosecution, and denied the assertion that she made, that he was the father of the child; that Dixon called with him both times; that on the first call nothing was said about White. It does not appear whether anything was said about him on the second call or not. It does appear that Dixon called twice afterwards, and the plaintiff testified that the last time he said if she would swear it on to White he would go and get $400. of him, and let her have part of it, and the defendant have a part, &c., and wanted her to sign an affidavit that it was White's, and she did so. On cross-examination she testified that Richard said when he came to see her, that he came on the part of his brother.

It is clear from the course of the trial, as shown by the bill of exceptions, that the defendant, after all the evidence was in, made use of the fact that the plaintiff had given such an affidavit, as a substantive ground and instrument of defence, as much so, and to the same intent and effect, as if he had produced and given the affidavit itself in evidence. What was elicited on cross-examination of the plaintiff supplied the fact and the matter of the affidavit, for all the purposes that the production and use of the affidavit itself could have served. So that, in legal effect, he used the affidavit as evidence in his own behalf, and against the plaintiff. Now it seems to us, that these facts so connected with the subject, so related to the affidavit, so involving the defendant in respect to his interest in the suit, and in his use of the affidavit, do constitute grounds for legitimate inferences by the jury, on the question whether or not the defendant had knowledge of, or participation in, the attempts which resulted in the procuring said affidavit. While it might, perhaps, be properly held that either of the facts alone, with none of the others connected or concurring, would be insignificant; yet, when taken in their order,

and combination, they become significant and potent, to some extent, towards showing that the defendant had such knowledge or participation. If, after the evidence on the part of the plaintiff was all given, bearing on the history of that affidavit, and the means by which it had been procured, the defendant had abandoned any use of the fact of its being so given, as evidence in his own favor, and against the plaintiff, the subject would have lacked an important element which it now possesses. When, in view of that evidence on the part of the plaintiff, he avails himself of the fact of the giving of said affidavit, for his own advantage on the trial, he must be held to take it *cum onere*, and, so far as the jury should find that his friends and attorney had, by improper and corrupt inducements, procured the making of it, be affected by the natural inferences, and legitimate results arising from an adoption, and implied ratification, of their damaging acts, as to his agency in, or knowledge of such acts.

The question is not whether this series and combination of facts *conclusively* show, but whether they *tend* to show, such knowledge or agency.

If there had been slight direct evidence of such knowledge, or agency, plainly the facts alluded to would be competent evidence to aid and strengthen such slight direct evidence. Yet its tendency is the same in both cases, viz : to show the alleged knowledge, or agency, of the defendant. It is *circumstantial*, but equally pertinent with direct evidence, either in aid of direct evidence, or to operate alone in the absence of direct evidence. It is for the jury, under proper instructions, to consider and weigh it, and to give it proper force and effect.

We think it was error to hold that there was no evidence tending to show that the defendant had any agency, or knowledge, in respect to the attempts to procure said affidavit.

The judgment is reversed and the case remanded.